UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
00-CV-1026(JMR/RLE)

| | | |
|---|---|---|
| Sherbrooke Turf, Inc. | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| Minnesota Department of Transportation et. al. | ) | |
| | ) | |

This matter is before the Court on the parties' cross-motions for summary judgment. Plaintiff asks the Court to find a federal statute broadening participation in road construction, maintenance and repair, and Minnesota's program implementing that statute, unconstitutional. Defendants ask the Court to find the Act and the Minnesota program in accord with the Constitution, and seek a dismissal of plaintiff's case.

For the reasons set forth below, defendants' motions are granted; plaintiff's motions are denied.

I. Background

A. The Parties

Sherbrooke Turf, Inc. ("Sherbrooke"), is a Minnesota corporation which provides landscaping services for land adjacent to highways. In order to be selected as a highway subcontractor, it submits bids on federally funded highway construction projects in this state. Sherbrooke is owned and operated by Caucasian males. Defendants are the Minnesota Department of Transportation ("MnDOT") and Elwyn Tinklenberg, in his capacity as Minnesota's Commissioner of Transportation. The United States of America, the

FILED
RICHARD D. SLETTEN, CLERK
JUDGEMENT ENTERED NOV 15 2001
DEPUTY CLERK'S INITIALS ______

United States Department of Transportation ("USDOT"), and the Federal Highway Administration ("FHA") have been permitted to intervene as defendants.

Sherbrooke claims the Disadvantaged Business Enterprise ("DBE") provisions of the Transportation Equity Act for the 21st Century ("TEA-21") are unconstitutional. Sherbrooke challenges the federal affirmative action programs. See In re Sherbrooke Sodding Co., 17 F. Supp. 2d 1026, 1028 (D. Min. 1998) Sherbrooke also challenges USDOT's implementing regulations, and MnDOT's participation in the DBE program. Plaintiff claims that because of its male-Caucasian ownership, it suffers a constitutional injury when bidding on Minnesota's federally funded road construction projects. Finally, Sherbrooke claims the DBE program is both facially unconstitutional and unconstitutional as applied.

B. Predecessors To The Federal Statute - TEA-21

TEA-21 is the latest in a series of federal highway funding acts first enacted in 1982, when Congress passed the Surface Transportation Assistance Act ("STAA"), Pub. L. No. 97-424, 96 Stat. 2097. Section 105(f) of the STAA required that not less than 10% of its appropriated funds be expended on small businesses called DBEs, owned and controlled by socially and economically disadvantaged individuals as defined by Section 8(d) of the Small Business Act. See 96 Stat. 2100.

The STAA defined DBEs by referring to the Small Business Act

("SBA"). The SBA, at § 8(d), identifies classes of individuals who are presumed to be socially and economically disadvantaged. It provides, "[t]he contractor shall presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans." 15 U.S.C. § 637(d)(1).

In 1987, Congress passed a second highway funding act, the Surface Transportation Uniform Relocation Assistance Act ("STURAA"), Pub. L. No. 100-17, 101 Stat. 132. It, too, contained language designed to broaden participation in highway construction. At § 106(c), STURAA directed that not less than 10% of appropriated federal funds be expended through DBEs. The STURAA expanded the SBA's definition of DBEs to include women who, by congressional ukase, also became presumed-to-be socially and economically disadvantaged. See 101 Stat. 145-146.

In 1991, Congress enacted a third statute, the Intermodal Surface Transportation Efficiency Act ("ISTEA"), Pub. L. No. 102-240, 105 Stat. 1914. In ISTEA, Congress again directed recipient-states to assure that not less than 10% of its highway construction funds were expended through DBEs. This Act maintained the STURAA's DBE definitions. Sherbrooke challenged ISTEA on constitutional grounds, and this Court found ISTEA to be unconstitutional. See Sherbrooke I, 17 F. Supp. 2d at 1037.

II. The Present Dispute

Congress enacted TEA-21 in 1998. Pub. L. No. 105-178, 112 Stat. 107 (1998). At § 1101(b), Congress again calls upon states to expend not less than 10% of their federal highway funds on DBE-provided services. TEA-21 maintains STURAA's designation of women as presumed socially and economically disadvantaged. See 101 Stat. 146, 112 Stat. 107. It also incorporates the SBA's definitions of other disadvantaged persons. 15 U.S.C. § 637(d)(1). A. Federal Regulations

USDOT promulgated federal regulations to implement TEA-21's DBE program. See 49 C.F.R. Part 26. Under these regulations, the recipient state's receipt of federal highway funds is conditioned on the state's establishing a DBE program. See id.; 49 C.F.R. § 26.21. USDOT monitors state implementation of the DBE program by reviewing state decisions and goals pursuant to regulation Part 26. Section 26.41 defines TEA-21's statutory 10% goal as follows:

> (a) The statutes authorizing this program provide that, except to the extent the Secretary determines otherwise, not less than 10 percent of the authorized funds are to be expended with DBEs.
> (b) This 10 percent goal is an aspirational goal at the national level, which the Department uses as a tool in evaluating and monitoring DBE's opportunities to participate in DOT-assisted contracts.
> (c) The national 10 percent goal does not authorize or require recipients to set overall or contract goals at the 10 percent level, or any other particular level, or to take any special administrative steps if their goals are above or below 10 percent.

49 C.F.R. § 26.41 (emphasis added).

USDOT has also established standards to guide states in setting goals and structuring their DBE programs. See 49 C.F.R. § 26.45; see also 112 Stat. 1101(b)(3) (requiring states to annually survey and compile records related to DBEs). This includes guidelines for state determination of the appropriate local percentage goal. See 49 C.F.R. § 26.45. Under the regulations, if a state's annual projected goal can be achieved through race-neutral means, the state must implement its contract without including goals during that year. See 49 C.F.R. § 26.51(f). The regulations encourage states to meet their DBE goals through race-neutral measures, see 49 C.F.R. § 26.51(a), and further indicate that as long as a state implements its DBE program in good faith, no penalty will be imposed for a failure to meet the aspirational goal, see C.F.R. § 26.47 (a) and (b).

B. Minnesota's DBE Program

Minnesota's DBE program was put in place pursuant to 49 C.F.R. § 26.45 following passage of TEA-21 in 1998. The federal regulations require that MnDOT's DBE program consider the number and types of certified DBEs in the area, and their readiness and ability to bid on construction contracts. See 49 C.F.R. § 26.45. This includes studying the DBEs' ability to obtain funding and bonding, collating data on employment programs, obtaining evidence from locally conducted disparity studies, and considering the

effects of any ongoing DBE programs. See id. MnDOT also evaluates the number of contracts it anticipates awarding during the upcoming year.

MnDOT has set an 11.6% overall goal for DBE participation. Under Part 26 of the federal regulations, it determined it could meet 2.6% of its participation goal using race and gender neutral means, including selecting DBEs based on the lowest bid; the remaining 9% of its goal was to be met through contract goals. To implement these highway contracting goals, Minnesota required each prime contract-bidder to provide evidence showing it either subcontracted to DBEs in order to meet the contract goal, or engaged in a good faith effort to meet it. See 49 C.F.R. § 53.

C. The Projects At Issue

Sherbrooke submitted bids for landscaping on two federally assisted highway projects -- "Stearns" and "Ottertail." MnDot set a DBE participation goal of 10% for the Stearns project, and a goal of 1.2% for the Ottertail project.

Sherbrooke claims it submitted the lowest bid for the Stearns project at $30,000. The prime contractor, Lunda Construction Co., awarded the job to Lawn & Driveway Service, Inc., a certified DBE, despite an arguably higher bid. Ottertail's prime contractor also awarded its highway sodding work to Lawn & Driveway Service, Inc. Sherbrooke claims that, although Lawn & Driveway Service's bid was lower, it did not include traffic control services which are often

necessary. According to Sherbrooke, its bid included these services, making its bid the lowest.

Sherbrooke claims its Caucasian-male ownership, which denied it DBE status, unlawfully encumbered its right to be selected for these jobs. Sherbrooke states it will continue to compete for subcontracting work on future federal highway projects, which will necessarily require it to compete with DBEs. Plaintiff estimates it bids on 200 projects each year; however, it does not indicate how many bids are successful, nor does it state the number of projects it secures against bids by certified DBEs.

D. <u>The Claim</u>

MnDOT's DBE program is, both facially and as applied, designed to increase federal highway construction participation by individuals and companies on the basis of race, sex, or national origin. Sherbrooke claims this program violates the Equal Protection Clause of the United States Constitution; its civil rights under 42 U.S.C. § 1981, § 1983, and § 2000(d); and Article I, § 2 of the Minnesota Constitution.

III. <u>The Adarand Principle</u>

The United States Supreme Court has established a "strict scrutiny" test to be applied to race-conscious remedial legislation. But it has carefully emphasized that strict scrutiny should not be considered "strict in scrutiny, but fatal in fact." <u>See Adarand Constructors, Inc. v. Pena</u>, 515 U.S.

200, 237, 115 S. Ct. 2097 (1995) [hereinafter, Adarand III]. When analyzing Adarand III's race-conscious congressional enactment, the Court noted that "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." See id.

While recognizing the constitutional validity of federally enacted race-conscious programs, Adarand III makes clear that federally enacted race-conscious preference programs, as well as state and locally enacted affirmative action programs, are subject to this "strict scrutiny" analysis. 515 U.S. at 235, 115 S. Ct. 2097; see also City of Richmond v. J. A. Croson Co., 488 U.S. 469, 508, 511, 109 S. Ct. 706 (1989) (applying strict scrutiny to local and state programs). The Adarand III Court found that "[f]ederal racial classifications, like those of a state, must serve a compelling interest, and must be narrowly tailored to further that interest." Adarand III, 515 U.S. at 235, 115 S. Ct. 2097.[1]

---

[1]TEA-21's DBE program covers not only race and national origin, but also includes gender based preferences. It appears that a slightly different analytic may apply to gender-based classifications. In examining gender-based preferences, the government must show "at least that the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" United States v. Virginia, 518 U.S. 515, 533, 116 S. Ct. 2264 (1996) (quoting Wengler v. Druggists Mut. Ins. Co., 446 U.S. 142, 150, 100 S. Ct. 1540 (1980)). This intermediate test is less stringent than the race-focused strict scrutiny standard. For purposes of this motion, the Court applies the more stringent standard to TEA-21 and its DBE program. As the program survives strict scrutiny, consideration of a lower standard of scrutiny is unnecessary.

Congressional enactments, said the Court, would receive no special deference. See id. at 218.

A. Summary Judgment Standard

Summary judgment is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246, 106 S. Ct. 2505 (1986). There are no disputed material facts in this case; the matter turns on a pure question of law, and summary judgment is appropriate.

B. Strict Scrutiny Applied

The TEA-21 statute, its implementing regulations, and Minnesota's DBE program permit consideration of race, national origin, and gender in deciding whether certain subcontractors will obtain work on transportation related construction projects. As such, the government bears the burden of showing the DBE program is constitutional. See Adarand III, 515 U.S. at 223, 115 S. Ct. 2097; United States v. Virginia, 518 U.S. 515, 533, 116 S. Ct. 2264 (1996). See also Adarand Constructors, Inc. v. Slater, 228 F.3d 1147, 1161-64 (10th Cir. 2000) (reviewing the constitutionality of the race-conscious provisions in TEA-21) [hereinafter Adarand VII].

1. Compelling Government Interest

The United States claims the Tenth Circuit Court of Appeals was correct when it stated in Adarand VII: "[The] federal

government has a compelling interest in not perpetuating the effects of racial discrimination in its own distribution of federal funds and in remediating the effects of past discrimination in the government contracting markets created by its disbursements." 228 F.3d at 1165. The United States makes two arguments in this regard. First, it argues Congress properly considered and developed a detailed legislative history leading to its finding of a compelling interest; second, that the Tenth Circuit made a sufficiently comprehensive analysis of Congress's legislative history when it upheld the program.

According to the United States, the Tenth Circuit, in Adarand VII, was correct when it found Congress had adequately considered the question of discrimination against minority subcontractors. The Tenth Circuit stated that Congress recognized:

> (1) evidence from the congressional record wherein Congress repeatedly considered the issue of discrimination in government construction procurement contracts; (2) statements of legislators during debate on TEA-21 . . .; (3) local disparity studies of minority subcontracting and studies of local subcontracting markets after the removal of affirmative action programs; and [(4)] evidence relating to numerous congressional investigations, hearing, and outside studies containing statistical and anecdotal evidence.

(United States, Mem. Summ. J., p. 10.)

The "benchmark for judging the adequacy of the government's factual predicate for affirmative action legislation [i]s whether there exists a strong basis in evidence for [the government's] conclusion that remedial action was necessary." See Adarand VII,

228 F.3d at 1166 (quoting Concrete Works, 36 F.3d 1513, 1521 (10th Cir. 1994) (citations omitted)) (emphasis in Concrete Works). To meet this standard, Congress must legislatively find "constitutional or statutory violations." Croson, 488 U.S. at 497, 109 S. Ct. 706 (quoting Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 307, 98 S. Ct. 2733 (1978)).

Congress may not merely express concern about such issues; it must make findings describing the problem's existence and the specific cure it prescribes. "Only then does the government have a compelling interest in favoring one race over another." See Croson, 488 U.S. at 497, 109 S. Ct. 706. The evidence used to justify a race-conscious program must have been considered prior to enactment of the legislation in question. See Rothe Dev. Corp. v. United States Dept. of Defense, 262 F.3d 306, 327-28 (Fed. Cir. 2001).

In the case of TEA-21, the Court finds Congress has complied with these requirements. Before adopting the Act, Congress considered evidence detailing the barriers faced by minority-owned construction firms and the specific nature of discrimination within the construction and subcontracting industry. See Adarand VII, 228 F.3d at 1168-72. Congress also reviewed a number of state and local disparity studies describing local construction subcontracting markets and the effects of affirmative action programs and discrimination within these markets. Lastly, Congress

reviewed evidence describing a significant statistical disparity in DBE and minority subcontracting in markets in the absence of affirmative action programs. Congress compiled this information in The Compelling Interest for Affirmative Action: A Preliminary Survey. 61 Fed. Reg. 26042, 26050 (May 23, 1996).

The Tenth Circuit painstakingly reviewed the congressional findings related to the passage of TEA-21. See Adarand VII, 228 F.3d 1166-75. After doing so, it found the evidence "only reinforces the conclusion that 'racial discrimination and its effects continue to impair the ability of minority-owned businesses to compete in the nation's contracting markets.'" Id. at 1175 (quoting The Compelling Interest, 62 Fed. Reg. at 26,062). The Tenth Circuit found the "evidence demonstrates that both the race-based barriers to entry and the ongoing race-based impediments to success faced by minority subcontracting enterprises . . . are caused either by continuing discrimination or the lingering effects of past discrimination in the relevant market." Id. at 1175-76; see also id. at 1176 ("We conclude that the evidence cited by the government and its amici, particularly that contained in The Compelling Interest, 61 Fed. Reg. 26,050, more than satisfies the government's burden of production regarding the compelling interest for a race-conscious remedy.").

Sherbrooke claims the Tenth Circuit's review of the congressional findings was insufficiently rigorous, and asks this

Court to conduct a more probing inquiry. Plaintiff claims the United States Supreme Court's decision in Kimel v. Florida Bd. of Regents mandates an independent judicial assessment of the data Congress reviewed prior enacting TEA-21. See 528 U.S. 62, 81, 120 S. Ct. 631 (2000).

Plaintiff is wrong; Kimel is a case which questioned whether Congress had compiled sufficient findings to pierce a state's Eleventh Amendment sovereign immunity. This is not such a case. While the Supreme Court's recent Eleventh Amendment jurisprudence may require a close look behind congressional findings, this rule is plainly limited to questions of state-federal sovereign immunity and protecting states from federal suits by their own citizens to enforce federally imposed rights.

Congress's attempts to address race and gender issues -- invoking its Commerce Clause and Fourteenth Amendment powers -- are readily distinguishable from actions which might abrogate sovereign immunity. The Supreme Court emphasized this point in City of Boerne v. Flores, when it said "[i]t is for Congress in the first instance to determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment, and its conclusions are entitled to much deference." 521 U.S. 519, 536, 117 S. Ct. 2157 (1997) (quotations omitted); see also Kimel, 528 U.S. at 83, 120 S. Ct. 631 (finding that congressional action remedying race or gender requires greater deference than action

addressing age discrimination, which lacked the "history or purposeful unequal treatment"); United States v. Lopez, 514 U.S. 549, 563-64, 115 S. Ct. 1624 (1995) (noting that Congress need not make particularized findings in order execute its Commerce Clause powers).

Plaintiff's ultimate request, that this Court review every document considered by Congress to independently determine the validity and worthiness of the compelling interest, is fatally flawed. This Court has no reason to suspect or doubt either the Tenth Circuit's or Congress's ability to ascertain and understand evidence related to the need for affirmative action in federal highway construction programs. If the Court were to do as plaintiff demands, and reconsider every piece of evidence presented to Congress -- thereby determining for itself whether the evidence presented a compelling interest -- this Court would impermissibly trench upon the legislative duties reserved to Congress in Article I of the United States Constitution.

Instead, the Court must look at the record produced by Congress to determine if Congress enacted TEA-21 on the basis of strong evidence. The record makes clear that Congress had a sufficient evidentiary basis on which to conclude that the persistence of racism and discrimination in highway subcontracting warranted a race-conscious procurement program. Its conclusion sufficiently satisfies the compelling interest requirement.

2. Narrowly Tailored

Once the United States establishes that a race-conscious program serves a compelling government interest, it must next show the program is narrowly tailored to serve the established interest. See Adarand III, 515 U.S. at 235, 115 S. Ct. 2097.

> This analysis considers several factors, including the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties.

United States v. Paradise, 480 U.S. 149, 171, 107 S. Ct. 1053 (1987) (plurality); see also id. at 187, 107 S. Ct. 1053 (Powell, J., concurring).[2]

a. Consideration of Race-Neutral Alternatives

Part of the narrow tailoring requirement asks "whether there was 'any consideration of the use of race-neutral means to increase minority business participation' in government contracting." Adarand III, 515 U.S. at 237-38, 115 S. Ct. 2097 (quoting Croson, 488 U.S. at 507, 109 S. Ct. 706). In this case, race-neutral means

---

[2]Justice Powell listed similar factors in his concurrence in United States v. Paradise, 480 U.S. at 187, 107 S. Ct. 1053:

> (i) the efficacy of alternative remedies; (ii) the planned duration of the remedy; (iii) the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force; (iv) the availability of waiver provisions if the hiring plan could not be met; and (v) the effect of the remedy upon innocent third parties.

were clearly considered.

In Sherbrooke I, this Court considered ISTEA and its DBE program, and found that both Congress and USDOT failed to consider race-neutral alternatives. See 17 F. Supp. 2d at 1035. That failure contributed to this Court's finding that ISTEA's DBE program was "Constitutionally flawed." Id. But before passing TEA-21, Congress specifically considered adopting race-neutral alternatives to a race-conscious program. See Report of the Committee on Transportation and Infrastructure, Report 105-467, Part 1, March 25, 1998, at 504-05.

TEA-21's implementing regulations reveal a heightened commitment to incorporating race-neutral elements in the DBE program. For example, 49 C.F.R. § 26.51 requires states to "meet the maximum feasible portion of [their] overall goal by using race-neutral means of facilitating DBE participation." 49 C.F.R. § 26.51(a); see also 49 C.F.R. § 26.51(f) (requiring contractors to implement the program using only race-neutral means when possible).

The regulations list a number of race-neutral measures to be used when awarding subcontracts. See 49 C.F.R. § 26.51(b); see also Croson, 488 U.S. at 509-10, 109 S. Ct. 706 (suggesting types of race-neutral alternatives to be employed in administering a constitutional DBE program). TEA-21's emphasis on alternatives to race-conscious subcontracting -- as emphasized in the regulations -- demonstrate that both Congress and USDOT considered race-neutral

alternatives in a fashion which compels the Court to find this a narrowly tailored program.

b. Limited Duration

Another narrow tailoring consideration asks whether a DBE program is "appropriately limited such that it 'will not last longer than the discriminatory effects it is designed to eliminate.'" Adarand III, 515 U.S. at 238, 115 S. Ct. 2097 (quoting Fullilove, 448 U.S. 448, 513, 100 S. Ct. 2758 (1980)). Plaintiff claims MnDOT failed to fully evaluate the extent of discrimination within the state, and as a result, neither the federal program nor the MnDOT program is narrowly tailored to end when discriminatory effects cease to be a problem.

The Tenth Circuit, in reviewing TEA-21, focused on the time limits for the DBE certification program. See Adarand VII, 228 F.3d at 1179-80; see also 15 U.S.C. §§ 634(b)(6), 636(j)(10)(C)(i), 637(a),(d). The Circuit Court found two certification provisions significant. First, each DBE is limited by regulation to approximately 10½ years in the program; second, the program requires annual certification of each DBE's financial and contracting records to prove continuing eligibility. See Adarand VII, 228 F.3d at 1179. Because each state sets its particular overall goal based in part on the availability and needs of local DBEs, see 49 C.F.R. § 26.45, the certification limits tailor the program's duration to local needs.

The United States and USDOT emphasize that TEA-21's DBE provision expires in 2004. See Police Officers' Federation of Minneapolis v. City of Minneapolis, 2001 WL 856021, *8 (D. Minn. July 17, 2001) (finding plan limited in duration when it includes within its terms a termination trigger). MnDOT also notes the federal regulations providing for termination of TEA-21's DBE program when a participating state meets its annual overall goals through race-neutral means in two consecutive years. See 49 C.F.R. § 26.51(f)(3). In other words, once a state has secured minority-subcontractor participation without the use of race-conscious means, the DBE program is discontinued.

Defendants' arguments are persuasive. TEA-21 is materially different from the statute the Court found unconstitutional in Sherbrooke I. In TEA-21, Congress, USDOT, and MnDOT have undertaken efforts to link the DBE program's duration to its success. Its duration-limiting provisions support its constitutionality.

c. Burden

The Court must also consider whether the construction industry's non-DBE subcontractors shoulder an unconstitutional burden as a result of TEA-21's affirmative action program. See Fullilove, 448 U.S. at 485, 100 S. Ct. 2758 (balancing the burden shouldered by non-minority firms against the overall construction contacting opportunities). A DBE program can place a significant

burden on non-DBE companies. But TEA-21 responds to this problem through its narrow tailoring and time limitations. See Sherbrooke I, 17 F. Supp. 2d at 1036 ("When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such a 'sharing of the burden' by innocent parties is not impermissible.") (quoting Fullilove, 448 U.S. at 484, 100 S. Ct. 2758).

TEA-21 also limits this burden by broadening the DBE program to increase the participation of non-minority DBEs. Under the regulations, DBE status is available to a broader group than those possessing racial, national origin, or gender classifications which Congress presumes disadvantaged. See 49 C.F.R. §§ 26.61(d), 26.67(d); 13 C.F.R. § 124.105(c)(1); see also Adarand VII, 228 F.3d at 1183. By utilizing an economic -- as contrasted to strictly birth-tied -- standard, the program increases DBE subcontracting through race-neutral means. The regulations also require states to monitor the number and type of DBEs in order to prevent over-concentration. 49 C.F.R. § 26.33. Although non-DBE contractors must inevitably bear some burden under TEA-21, USDOT and MnDOT have sufficiently linked the DBE program to evidence of discrimination and reduced the shared burden to a constitutionally permissible level.

d. Flexibility

Sherbrooke claims MnDOT's DBE program is inflexible, because it can force a prime contractor to accept a higher subcontracting bid if the price difference between the DBE and non-DBE bid is not "excessive" or "unreasonable." According to plaintiff, the program's aspirational goals are overly restrictive, and therefore unconstitutional. To support this position, Sherbrooke cites this Court's decision in Sherbrooke I. See 17 F. Supp. 2d at 1037. The United States, USDOT and MnDOT deny the program is inflexible. Defendants are correct.

Unlike the USDOT's predecessor program, neither MnDOT's implementing regulations nor TEA-21 includes rigid quotas. Instead, under the new program language, quotas are explicitly forbidden. See 49 C.F.R. § 26.43. Although each state is required to set overall goals based on its local situation, see 49 C.F.R. § 26.45, it is not bound to TEA-21's 10% goal. Under the regulations, a state which tries but does not meet its DBE goals is not penalized. See 49 C.F.R. § 26.47. The regulations go further, permitting a state to "apply for an exemption from any provision of this part." See 49 C.F.R. § 26.15; see also Adarand VII, 228 F.3d at 1180 (finding the waiver provision persuasive evidence of flexibility).

Plaintiff claims Minnesota's decision to opt into the DBE program rather than attempt to opt out of it, demonstrates a lack

of flexibility. See Pl. Reply at 7. The claim is specious. If this argument were to prevail, the only ultimate proof a state could offer to show flexibility would be its efforts to reject the program entirely. This is not the law. See Adarand III, 515 U.S. at 237, 115 S. Ct. 2097 (stating that strict scrutiny does not disqualify states from acting to respond to the effects of discrimination); Ellis v. Skinner, 961 F.2d 912, 916 (10th Cir. 1992).

e. Random Inclusion

Plaintiff complains that, "as written, 49 C.F.R. § 23.62 presumes everyone in America has suffered discrimination except white males." Building upon this assertion, plaintiff argues that the economic disadvantage alternative to certification insufficiently mitigates the effect of the blanket presumption. See Pl. Mem. Summ. J. at 22. Sherbrooke extends its argument claiming that, in practice, the economic disadvantage provisions encompass more than 91% of all business owners. See id. at 23. Based upon these premises, plaintiff claims prime contractors are compelled to use race-conscious measures to comply with the DBE program. It contends the program allows everyone except Caucasian males, regardless of any actual history of discrimination, to obtain the benefits of the DBE program.

This somewhat florid argument fails. The United States Supreme Court has expressed grave concerns about programs which

afford random or blanket benefits to minority groups without connecting these benefits to a specific history of discrimination. See Croson, 488 U.S. at 506, 109 S. Ct. 706. On the other hand, as the Tenth Circuit has stated, "[w]hile the concept of classifying human beings by race is distasteful, the fact remains that discrimination occurs based on such classifications, and engaging such discrimination is a necessary evil which constitutes a compelling government interest." See Adarand VII, 228 F.3d at 1186. It may be sad, but it is true, that Congress cannot enact a national program to remedy discrimination without going through the painful process of recognizing classes of people whose history has shown them to be subject to discrimination and allowing states to include those people in its DBE program. See id. at 1186-87.

> [B]ecause of the unreliability of racial and ethnic categories and the fact that discrimination commonly occurs based on much broader racial classifications, extrapolating findings of discrimination against Native Americans, Asian-Pacific Americans, and Asian-Americans to include Aleuts, Samoans, and Bhutanese respectively, is more a question of nomenclature than of narrow tailoring. The Constitution does not erect a barrier to the government's effort to combat discrimination based on broad racial classifications that might prevent it from enumerating particular ethnic origins falling within such classifications.

Id. at 1185-86.

Importantly, TEA-21's DBE program attempts to avoid the potentially invidious effects of providing blanket benefits to minorities. It does so, in part, by restricting a state's DBE preference to identified groups actually appearing in the target

state. In practice, this means Minnesota can only certify members of one or another group as potential DBEs if they are present in the local market. This minimizes the chance that individuals -- simply on the basis of their birth -- will benefit from Minnesota's DBE program. If a group is not present in the local market, or if they are found in such small numbers that they cannot be expected to be able to participate in the kinds of construction work TEA-21 covers, that group will not be included in the accounting used to set Minnesota's overall DBE contracting goal.

The Court finds defendants have shown a factual and logical connection between the race-conscious measures included in TEA-21 and the ongoing effects of discrimination in the highway construction industry.

C. <u>Plaintiff's "As Applied" Challenge</u>

Plaintiff argues TEA-21 and MnDOT's program are invalid as applied, because they unconstitutionally deprive plaintiff of the ability to compete for subcontracts on federally funded highway projects. Plaintiff, however, fails to offer sufficient facts to support this claim.

Plaintiff does offer the possibility that it lost out on the Stearns and Ottertail subcontracts because of its Caucasian male ownership. But it fails to show that its inability to secure these subcontracts is related to TEA-21's or MnDot's DBE program. The bid differences in the Stearns and Ottertail subcontracts were

marginal at best, as each of the bidding subcontractors included slightly different work in its proposal. In both cases, the successful competitor was a DBE entity, but there is no showing the company was selected for that reason. As such, there is only a conjectural showing that TEA-21 and Minnesota's DBE program caused an unconstitutional burden in either situation.

The proffered deposition testimony demonstrates that the existence of the DBE program neither discouraged plaintiff from submitting project bids, nor resulted in any probable loss of contracts because of the owner's race. While plaintiff submits approximately 200 bids each year, plaintiff identified only two contracts where the DBE program possibly affected the ultimate selection of a subcontractor. In other words, the application of the DBE program did not limit plaintiff's ability to compete for landscaping subcontracts. The Court finds there is insufficient evidence demonstrating a triable issue as to whether the programs are invalid as applied.

D. Minnesota's Independent Burden

Plaintiff claims MnDOT must independently demonstrate how its program comports with Croson's strict scrutiny standard. Plaintiff is mistaken. The Constitution calls out far different requirements when a state implements a federal affirmative action program, as opposed to those occasions when a state or locality initiates the program. See Milwaukee County Pavers Assoc. v. Fiedler, 922 F.2d

419, 423 (7th Cir. 1991); see also Ellis, 961 F.2d at 916 (10th Cir. 1992); Tennessee Asphalt Co. v. Farris, 942 F.2d 696, 975 (6th Cir. 1991).[3]

In Croson, the Supreme Court held that states and localities establishing local affirmative action programs must demonstrate a "strong basis in evidence for [the] conclusion that remedial action was necessary." See Croson, 488 U.S. at 500, 109 S. Ct. 706 (citations omitted). TEA-21 is not, however, a state or locally based program. It was enacted by a Congress which made appropriate findings, as indicated above. When Congress establishes a constitutionally valid nationwide program, the federal courts afford greater deference to its national policy decisions. See Turner Broad. Sys. Inc. v. Federal Communications Comm'n, 520 U.S. 180, 195-96, 117 S. Ct. 1174 (1997).

Sherbrooke's assertions that Minnesota bears a separate Croson burden are not well-taken when these principles are applied. States which establish DBE programs under TEA-21 and Part 26 of its

---

[3]The Tenth Circuit, in Adarand VII, considered whether the state had an independent compelling interest. See Adarand VII, 228 F.3d at 1174. The Court found evidence of a dramatic reduction in DBE participation in the absence of a DBE program supportive of a finding of a compelling interest. See id. Here, in the State of Minnesota, defendants indicated that during 1999 -- the period when this Court enjoined MnDOT from implementing a previous DBE program -- DBE participation dropped from over 10 percent to slightly more than 2 percent. The Court notes this decline in participation only in dicta, because the Court need not determine whether this provides Minnesota with a compelling interest. As above, this is because TEA-21, being a federal program, relieves the state of any burden to independently carry the strict scrutiny burden.

regulations are implementing a congressionally required program -- not establishing local ones. The waiver section of the federal regulations does not alter the mandatory federal nature of the program. When MnDOT participates in a heavily regulated federal program such as this, it need not independently prove its DBE program meets the strict scrutiny standard. See Milwaukee County Pavers Association, 922 F.2d at 423; see also id. at 424 (finding that "insofar as the state is merely doing what the statute and regulations envisage and permit, the attack on the state is an impermissible collateral attack on the statute and regulations," even when participation in program is not required); Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo, 981 F.2d 50, 56-7 (2d Cir. 1992); Tennessee Asphalt Co. v. Farris, 942 F.2d at 975.

III. Conclusion

The Court finds defendants are entitled to summary judgment. Having found MnDOT's program in accord with the United States Constitution, the Court declines to exercise supplemental jurisdiction over plaintiff's claim premised on the Minnesota Constitution. 28 U.S.C. § 1367.

Accordingly, IT IS ORDERED that:

1. Defendants' motion for summary judgment is granted.

2. Plaintiff's motion for summary judgment is denied.

3. Plaintiff's motion for a temporary restraining order is denied.

4. Plaintiff's motion for a preliminary injunction is denied.

LET JUDGEMENT BE ENTERED ACCORDINGLY.

Dated: November 14th, 2001

JAMES M. ROSENBAUM
United States Chief District Judge

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

> ***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.